UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No.  24cr10309 |
| ) | |
| v.                       ) | Violations: |
| ) | |
| JDM SUPPLY, LLC,          ) | Count One: Conspiracy to Introduce Misbranded |
| DANIEL MOTHA, and         ) | Devices into Interstate Commerce |
| JEFFREY MOTHA,            ) | (18 U.S.C. § 371) |
| ) | |
| Defendants.        ) | Count Two: Introduction of Misbranded Devices |
| ) | into Interstate Commerce |
| ) | (21 U.S.C. §§ 331(a) and 333(a)(1)) |
| ) | |
| ) | Count Three: Conspiracy to Commit Price |
| ) | Gouging |
| ) | (18 U.S.C. § 371) |
| ) | |
| ) | Forfeiture Allegation: |
| ) | (18 U.S.C. § 982(a)(7)) |
| ) | |

INFORMATION

At all times relevant to this Information:

General Allegations

1.    JDM Supply LLC (JDM) was a limited liability company formed in Florida by

DANIEL MOTHA (D. MOTHA) on or about March 11, 2020 in response to the COVID-19

pandemic.

2.    D. MOTHA was a resident of Florida.   D. MOTHA co-owned JDM and served as

its chief executive officer.

3.    JEFFREY MOTHA (J. MOTHA) was a resident of Massachusetts.   J. MOTHA

co-owned JDM and served as its head of sales.   J. MOTHA and D. MOTHA were brothers.

1

4.      CW-1 was a resident of Massachusetts and a longtime friend of J. MOTHA and D. MOTHA.   CW-1 was a representative of JDM.

5.      COMPANY 1 was a limited liability company formed in Delaware on or about May 26, 2020, with its principal place of business in Santa Clara, California.   Prior to the formal creation of COMPANY 1, the owners of COMPANY 1 operated a joint venture under a similar trade name.

6.      INDIVIDUAL 1 was a resident of California.   INDIVIDUAL 1 was a co-founder and chief technology officer of COMPANY 1.

7.      INDIVIDUAL 2 was a resident of California.   INDIVIDUAL 2 was a co-founder and chief business officer of COMPANY 1.

8.      INDIVIDUAL 3 was a resident of California.   INDIVIDUAL 3 was a co-founder and chief operating officer of COMPANY 1.

9.      In or around the spring of 2020, during the earliest phase of the COVID-19 pandemic in the United States, JDM and COMPANY 1 conspired to ship facemasks that were misbranded as NIOSH-approved, N95 respirators.   As further described below, one desperate hospital accepted and paid for hundreds of thousands of purported N95 masks that were manufactured by COMPANY 1 and sold by JDM.   JDM and COMPANY 1 misled the hospital into believing that the COMPANY 1 masks were NIOSH-approved N95s, when in fact they were not.

10.      In addition, JDM, D. MOTHA, and J. MOTHA took advantage of the COVID-19 pandemic by price gouging—that is, by purchasing and reselling other N95 respirators to hospitals in excess of prevailing market prices.

2

I.      The FDA and the Federal Food, Drug, and Cosmetic Act

11.     The United States Food and Drug Administration (FDA) was responsible for protecting the health and safety of the American public by ensuring, among other things, that medical devices are safe and effective for their intended uses and bear labeling that contains true and accurate information.   The FDA regulated the manufacturing, labeling, and distribution of medical devices shipped or received in interstate commerce and enforced the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* (FDCA).

12.     The FDCA prohibited, among other things, the introduction, delivery for introduction, or causing the introduction or delivery for introduction into interstate commerce of a misbranded device.   21 U.S.C. § 331(a).   A violation of the statute committed with an intent to defraud or mislead would convert the offense from a strict liability misdemeanor to a felony.   21 U.S.C. § 333(a)(2).

13.     Under the FDCA, a medical device was misbranded if, among other things, the labeling for the device was "false or misleading" in any part.   21 U.S.C. § 352(a)(1).

14.     Under the FDCA, "labeling" was defined as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."   21 U.S.C. § 321(m).

15.     Under the FDCA, "interstate commerce" was defined, in part, as "commerce between any State or Territory and any place outside thereof."   21 U.S.C. § 321(b).

16.     Under the FDCA, a "device" was defined, in part, as "an instrument, apparatus, implement, machine, contrivance, . . . or other similar or related article, including any component,

part, or accessory, which is . . . (2) intended for use in the [] mitigation . . . or prevention of disease, in man . . ., and which does not achieve its primary intended purposes through chemical action within or on the body of man . . . and which is not dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. § 321(h)(1).

17.     Face masks and respirators were "devices" subject to the FDCA when they were intended for a medical purpose, such as prevention of infectious disease transmission (including uses relating to COVID-19).

II.     N95 Respirators and NIOSH

18.     The arrival of the COVID-19 virus in the United States in early 2020 created an urgent and unprecedent demand among healthcare providers for personal protective equipment (PPE).   In particular, healthcare providers turned to N95 respirators (often referred to as N95 masks) as a critical last line of defense against this highly contagious and potentially deadly virus.

19.     N95 respirators are regulated in the United States by the Centers for Disease Control and Prevention's (CDC) National Institute for Occupational Safety and Health (NIOSH).

20.     To be marketed and sold as an "N95" respirator in the United States, a respirator must be evaluated and approved by NIOSH.   Under the applicable regulations, an N95 respirator must filter at least 95 percent of airborne particles.[1]   A respirator that did not filter at least 95 percent of airborne particles could not be legally marketed or sold in the United States as an "N95" respirator.[2]

---

[1] 42 CFR Part 84, Subpart K § 84.174(i) and § 84.170 to 84.181.
[2] The applicable regulation defined the term N95 to refer to a filter class that removed at least 95% of airborne particles during "worst case" testing using a "most-penetrating" sized particle during NIOSH testing.   42 C.F.R. Part 84.

4

21.     In connection with the COVID-19 pandemic, the CDC recommended that healthcare workers use N95 respirators in hospitals and other medical treatment environments.

III.     JDM and COMPANY 1 Entered the PPE Business in Response to COVID-19

22.     Beginning in and about March 2020, the Defendants saw a significant business opportunity in meeting the unprecedented demand for N95 respirators.   COMPANY 1, led by INDIVIDUAL 1, INDIVIDUAL 2, and INDIVIDUAL 3, became a mask manufacturer. INDIVIDUAL 1 was primarily responsible for manufacturing and production of the COMPANY 1 mask, including dealing with material suppliers, operating the machines, designing the mask, testing the mask, and dealing with NIOSH.   INDIVIDUAL 1 and INDIVIDUAL 2 were primarily responsible for the commercial side of the mask business, including sales of the COMPANY 1 mask to distributors such as JDM.

23.     JDM, led by D. MOTHA and J. MOTHA, was a distributor of the COMPANY 1 mask.   JDM sold the COMPANY 1 mask to hospitals, which entered into large purchase orders even before production of the COMPANY 1 mask began.   D. MOTHA and J. MOTHA jointly operated JDM.   D. MOTHA was primarily responsible for finances, sales, and operations, while J. MOTHA focused on sales.

24.     Prior to the COVID-19 pandemic, neither JDM nor COMPANY 1 were involved in healthcare or PPE.   COMPANY 1 (and its predecessor) was a contract manufacturing company whose products included marketing displays for trade shows.   JDM did not exist.

25.     Both JDM and COMPANY 1 recognized that selling N95 respirators to desperate healthcare providers was a million-dollar business opportunity.   As INDIVIDUAL 3 wrote to his business partners on or about March 8, 2020 regarding their new mask manufacturing venture,

"This seems too easy to be making millions."   Similarly, on or about March 19, 2020, CW-1 wrote

to D. MOTHA and J. MOTHA: "Need [COMPANY 1] to come through / like we need them to

come through we can make 5 million dollars if they do."

26.     On or about March 10, 2020, D. MOTHA and J. MOTHA were introduced to

INDIVIDUAL 3 in a WhatsApp messaging chat.   At that point, the COMPANY 1 mask was still

in the pre-production phase.   INDIVIDUAL 3 wrote to D. MOTHA, J. MOTHA, and others: "I

need [to] make sure you understand these are not niosh and fda approved yet (although we're fast

tracked to be in 2 months hopefully) and they are not fluid [resistant] like the 3M 1860.   This is

just as if not more effective than all other n95s like the [3M N95 respirator model] 8210."

27.     On or about March 15, 2020, INDIVIDUAL 3 created a document outlining a three-

step process for testing and approval of the COMPANY 1 mask (the "Three-Step Document"),

which he sent to D. MOTHA and J. MOTHA.   The first step was testing and certification of the

source material for the mask, which was provided to COMPANY 1 by SUPPLIER 1.

28.     The second step was testing and certification of the finished COMPANY 1 mask,

which INDIVIDUAL 3 wrote was "the critical step."   COMPANY 1 had lined up LAB 1, a

nationally recognized lab for N95 certification, to conduct that testing.   Based on testing

performed on the source material (and provided to COMPANY 1 by SUPPLIER 1), COMPANY

1 was confident the mask would pass that second step, but as INDIVIDUAL 3 wrote, "The risk

of not passing is very low, but not zero."

29.     The third step was certification that NIOSH and FDA approved the COMPANY 1

mask.   However, the Three-Step Document stated that "[t]he product begins shipping after N95

Certification," which COMPANY 1 anticipated by early April 2020.

6

30.     Along with the Three-Step Document, INDIVIDUAL 3 provided to D. MOTHA and J. MOTHA a copy of a brief letter addressed to INDIVIDUAL 1 from a representative of SUPPLIER 1.   In that letter, the representative stated that the source material provided to COMPANY 1 would have a filtration efficiency of higher than 95%, but added: "To claim the N95 Rating, the finished product needs to be certified by the National Institute for Occupational Safety and Health (NIOSH)."

31.     On or about March 17, 2020, INDIVIDUAL 3 wrote to D. MOTHA and J. MOTHA on WhatsApp: "We don't ship unless product passes n95.   Hospital will get product that meets it.   I guess I can't say more than I've already stated in that letter re certification."

32.     On or about March 19, 2020, JDM and COMPANY 1 executed an agreement for JDM to be a distributor for COMPANY 1.   JDM agreed to provide a $20,000 advanced payment for 100,000 units at $1.75 per mask for a total purchase order of $175,000.   COMPANY 1 represented "that the source material has already been tested and certified N95 compliant." COMPANY 1 guaranteed "any funds sent by JDM against the representation that the masks will be completed, certified N95 (and FDA and NIOSH will be applied for) and shipped as quickly as possible."

IV.     JDM Sold the COMPANY 1 Mask to Hospitals as an "N95 Respirator"

33.     COMPANY 1 told JDM that the COMPANY 1 masks would be certified as N95s and approved by NIOSH, expecting that JDM would communicate that to hospitals as part of its sales pitch.   JDM then sold the COMPANY 1 mask to hospitals as an "N95 respirator."

34.     In March 2020, JDM obtained purchase orders for the COMPANY 1 mask from three hospital systems: HOSPITAL 1, HOSPITAL 2,[3] and HOSPITAL 3.   HOSPITAL 2 ordered 500,000 COMPANY 1 N95 masks from JDM, at a cost of $2.50 per mask.   HOSPITAL 3 ordered 100,000 COMPANY 1 N95 masks from JDM, at a cost of $2.80 per mask but, before receiving any masks, canceled its order due to production delays.

35.     On or about the following dates, HOSPITAL 1, a hospital system based in South Florida, ordered a total of approximately 850,000 COMPANY 1 N95 masks from JDM:

| Purchase Order Date | Quantity | Price/Mask | Total |
| --- | --- | --- | --- |
| 3/17/20 | 50,000 | $2.90 | $145,000 |
| 3/24/20 | 100,000 | $2.90 | $290,000 |
| 3/24/20 | 200,000 | $2.90 | $580,000 |
| 3/30/20 | 100,000 | $3.25 | $325,000 |
| 4/1/20 | 200,000 | $3.25 | $650,000 |
| 4/10/20 | 200,000 | $3.25 | $650,000 |

36.     HOSPITAL 1 paid JDM 15% of the total cost (approximately $374,000) as a deposit at the time of the purchase order.   HOSPITAL 1 paid the remaining balance upon delivery and acceptance of the COMPANY 1 masks.

V.     JDM Reassured HOSPITAL 1 That the Masks Would Be NIOSH-Approved

37.     On or about April 4, 2020, D. MOTHA wrote to INDIVIDUAL 1, INDIVIDUAL 3, and others on WhatsApp that they had a problem with HOSPITAL 1.   D. MOTHA reported that HOSPITAL 1 was asking about the timeline for NIOSH certification of the COMPANY 1 N95 mask, and that HOSPITAL 1 "might cancel some of their order because theyre [sic] not NIOSH."

---

[3] HOSPITAL 2 was based in Massachusetts.

8

38.     On or about April 8, 2020, at the direction of INDIVIDUAL 2 and INDIVIDUAL 3, INDIVIDUAL 4, a representative and co-owner of COMPANY 1, sent an email to D. MOTHA with information to reassure HOSPITAL 1.   The email attached a new "spec sheet" for the "foldable N95 [COMPANY 1] mask" that indicated that the mask would be an N95 respirator.

39.     D. MOTHA took that and composed an email to HOSPITAL REP. 1, JDM's main point of contact at HOSPITAL 1.   In the email, D. MOTHA wrote, in part:

> The most important piece to any respirator is their filtration efficiency and that it comes in 95% or higher. The process for certification is at production the masks are reviewed/tested by a testing laboratory, in this case, [LAB 1], which is an international accredited medical testing laboratory. Once testing is complete and they pass, they issue the N95 certification (which should be by the end of next week), and masks can start being shipped out to hospitals. …

> Again, I want to make it clear, THESE MASKS WILL BE NIOSH CERTIFIED. …

40.     D. MOTHA's email included the spec sheet as an attachment.   The spec sheet thus was part of the labeling that accompanied the COMPANY 1 masks to HOSPITAL 1.

41.     D. MOTHA reassured HOSPITAL REP. 1 that "N95 certification" from LAB 1 was coming ("should be by the end of next week") and that the COMPANY 1 masks would be NIOSH-certified.   HOSPITAL 1 did not cancel its order.

VI.   JDM's Internal Concerns About the COMPANY 1 Mask

42.     To help sell the COMPANY 1 mask, JDM recruited other individuals to call hospitals on behalf of JDM, including Veterans Affairs (VA) hospitals.   JDM REP. 1, a friend of D. MOTHA, was one of those individuals.   D. MOTHA put JDM REP. 1 in touch with CW-1, the first individual whom D. MOTHA and J. MOTHA had recruited to work for JDM.

9

43.     On or about April 17, 2020, JDM REP. 1 raised concerns about the COMPANY 1

mask to CW-1 during a WhatsApp conversation.   Based on the COMPANY 1 spec sheet, JDM

REP. 1 wrote that the COMPANY 1 mask looked "like dog shit" and added: "We're all going to

jail I know it."

44.     CW-1 reassured JDM REP. 1, based on information D. MOTHA and J. MOTHA

had provided to CW-1, that the COMPANY 1 mask would be NIOSH and N95 certified by the

time it was delivered to hospitals.

45.     JDM REP. 1 wrote: "If I do jail time I taking [sic] [D. MOTHA] down w me damn

[it]."   JDM REP. 1 explained his concerns about the COMPANY 1 mask: "Cause it will come

out thousands of health care workers got infected and died cause these things are bogus."

46.     JDM REP. 1 raised the same concerns to J. MOTHA.   On or about April 17, 2020,

JDM REP. 1 texted J. MOTHA, in reference to the COMPANY 1 mask: "Doesn't even

recommend for medical/hospital environment use!   Oh boy we're all going to jail."   J. MOTHA

replied that it did not matter, as all that mattered was that the mask would be "N95 niosh

approved."   JDM REP. 1 also texted with J. MOTHA about COMPANY 1, and the pictures of

the COMPANY 1 management team on the company's website:

| | |
|---|---|
| JDM REP. 1: | We're all going to get locked up |
| J. MOTHA: | [INDIVIDUAL 1] is a pretty cool guy |
| | He is the CEO |
| JDM REP. 1: | Yeah cool enough to get us all locked up by the feds |
| J. MOTHA: | I don't think so |

> JDM REP. 1:    When this shot [sic] doesn't work and we
> infect 5000 nurses

47.    JDM REP. 1 questioned whether hospitals would purchase the COMPANY 1 mask without NIOSH approval; J. MOTHA responded: "We have just been saying they are rated and certified N95 by [LAB 1] which is the most important part and the niosh approval is happening before the end of April."

VII.    <u>COMPANY 1 Shipped Masks Without Successful Testing or N95 Approval</u>

48.    Because of delays, COMPANY 1 did not begin producing masks until in or about late April 2020.   To start, COMPANY 1 produced an ear loop mask, with straps that went around the wearer's ears to secure the mask to their face (as opposed to a "head strap" that went around the back of the wearer's head).

49.    COMPANY 1 submitted samples of the ear loop mask to LAB 1 for testing to confirm that the finished mask passed the "critical" second step outlined in the Three-Step Document and performed as an N95 respirator.   COMPANY 1 paid extra for expedited testing. LAB 1, however, informed COMPANY 1 that the lab was backed up because of overwhelming demand due to the pandemic, and that the testing on the COMPANY 1 mask would be delayed for months, until July 2020.

50.    On or about April 30, 2020, COMPANY 1 began shipping ear loop masks from its factory in California to HOSPITAL 1 in Florida and HOSPITAL 2 in Massachusetts—without any lab testing on the finished mask—contrary to INDIVIDUAL 3's March 17, 2020 statement that the product would not ship until it was certified as an N95 respirator.

51.    The COMPANY 1 ear loop mask was not approved by NIOSH.   In early to mid-May 2020, COMPANY 1 learned that NIOSH would not certify any mask with an ear loop design

as an N95 respirator, but that was not communicated to HOSPITAL 1.   Because the mask was not approved by NIOSH, it was not an "N95" and could not be labeled or branded as such, as JDM and COMPANY 1 understood.   Nor could the mask be labeled or branded as a "respirator." Instead, it would be classified as a "face mask."

52.     JDM and COMPANY 1 also understood that they could not make representations about the filtration efficiency of the ear loop mask (such as "N95").   For that reason, the COMPANY 1 ear loop mask did not say "N95" on it, and the boxes in which the masks were shipped did not say "N95" either.   However, COMPANY 1's spec sheet described the masks as N95, and JDM told HOSPITAL 1 and HOSPITAL 2 that they would receive N95 respirators.

53.     COMPANY 1 began shipping the COMPANY 1 mask to HOSPITAL 1 and HOSPITAL 2 in or about late April 2020.   HOSPITAL 1 did not use or evaluate the COMPANY 1 masks right away but instead kept the COMPANY 1 masks in a warehouse as the hospital worked through its remaining supply of other N95 respirators.

54.     In or around May 2020, HOSPITAL 2 gave the COMPANY 1 mask to its COVID response team for evaluation.   A safety officer for HOSPITAL 2 flagged multiple concerns about the COMPANY 1 mask, including that the masks did not say "NIOSH Approved[.]"   In an email on or about May 5, 2020, the logistics director for HOSPITAL 2's COVID response team wrote to other staff at HOSPITAL 2 about the COMPANY 1 mask: "what we can tell you is that these 200,000 are not even good to wear as a surgical mask – they literally fall apart in your hands – the straps break the first 20 minutes of being worn.   My suggestion is to put them in storage – they really should not even be out where anyone could think they can be used …."

55.     On or about May 8, 2020, the purchasing director for HOSPITAL 2, who was JDM's main point of contact, emailed J. MOTHA (at an email address in CW-1's name) and reported the issues raised by the COVID response team.   He wrote in part: "my thought is I can keep what you sent and what you will send and use them as regular masks but I can't pay $2.50. I am paying .50-.60 for regular procedure masks that I am willing to pay for these.   That is the only way these can be used."

VIII.   <u>University Lab Testing of COMPANY 1 Masks Raised a Red Flag</u>

56.     The purchasing director shared an additional piece of information with JDM: HOSPITAL 2 sent a sample of the COMPANY 1 masks to be tested by a lab at a Massachusetts-based university ("University Lab") that had volunteered to test PPE during the earliest days of the pandemic.

57.     D. MOTHA forwarded the message to INDIVIDUAL 1 and INDIVIDUAL 3, writing: "This is what we were trying to avoid.   Please see response below from [HOSPITAL 2]. Really need [LAB 1] testing … I need to provide N95 proof right now."

58.     INDIVIDUAL 1 responded to D. MOTHA that the source material for the masks "crush the N95 standard" and sent test results from LAB 1, which SUPPLIER 1 had provided to COMPANY 1 and purported to be for the source materials for the COMPANY 1 mask.[4]   JDM and COMPANY 1 understood that testing on the source material (step one of the Three-Step Document) was insufficient to represent that the ear loop mask was an N95.   As D. MOTHA wrote to COMPANY 1 in a WhatsApp message: "We were promised that [LAB 1] would provide

---

[4] However, the source materials sent for this testing were different from the source material used to make the masks provided to HOSPITAL 2.

a report that [COMPANY 1] MASKS ARE N95. The mill can make great material but if the masks aren't put together properly they're not N95."

59.    On or about May 9, 2020, a University Lab professor emailed the results of the testing on the COMPANY 1 mask: the filtration efficiency was 79%, which was below the level the University Lab measured for certified N95s but about average for Chinese-made KN95s. The University Lab professor also explained that the University Lab testing protocol was not the same as the protocol used by NIOSH because the University Lab did not have the same equipment and instead had to approximate the NIOSH protocol for N95 testing.

60.    In response to the University Lab testing results, CW-1, D. MOTHA, and J. MOTHA texted as follows:

| CW-1: | [University Lab] says the mask is N79 Read email |
| D. MOTHA: | What email |
| CW-1: | We are all going to jail just like [JDM Rep. 1] said |

61.    D. MOTHA forwarded the University Lab testing results to INDIVIDUAL 1 and INDIVIDUAL 3. INDIVIDUAL 1 forwarded the email to SUPPLIER 1, which checked with an expert in the field, who responded that the University Lab test was "not a valid or accurate test for determining N95[.]" INDIVIDUAL 1 shared that response with D. MOTHA and J. MOTHA.

62.    JDM forwarded the rebuttal from SUPPLIER 1's expert to the University Lab professor, along with the LAB 1 testing on the source material provided by INDIVIDUAL 1. The University Lab professor responded to the points raised in the rebuttal and explained that the testing on the source material was for medical face masks, not N95 respirators. The University

14

Lab professor added: "If you intend to use the [COMPANY 1] devices as N95's or equivalent, then I would encourage you to have [LAB 1] run [the NIOSH protocol] for you, if you have not done so already."

63.     Based on the University Lab testing, HOSPITAL 2 rejected the COMPANY 1 mask, returning the units it received and cancelling further shipments.   HOSPITAL 2 also told JDM that the straps broke easily; as D. MOTHA wrote to COMPANY 1 on or about May 11, 2020: "FYI they also had issues with the bands ripping off so regardless of N95 they want to send them back."

64.     HOSPITAL 1 was not told about the issues reported by HOSPITAL 2, the University Lab testing, or the return of the masks by HOSPITAL 2.

65.     On or about May 13, 2020, INDIVIDUAL 3 wrote to the other managers of COMPANY 1 on WhatsApp: "We owe the JDM guys so much for being our guinea pigs. Strippers and beer as [INDIVIDUAL 1] might suggest."

IX.   <u>The COMPANY 1 Masks Failed N95 Testing by "LAB 2," Which Was Not Disclosed to Hospital 1</u>

66.     On or about May 1, 2020, after learning that the LAB 1 testing would be delayed, INDIVIDUAL 1 contacted a second lab, LAB 2.   INDIVIDUAL 1 arranged for a sample of the COMPANY 1 ear loop masks to be tested by LAB 2. On or about May 8, 2020, COMPANY 1 submitted the samples to LAB 2.   LAB 2 told INDIVIDUAL 1 that he should expect the results in two to four weeks.   INDIVIDUAL 3 also informed JDM that samples of the COMPANY 1 ear loop mask had been submitted to LAB 2 for testing.   JDM and COMPANY 1 hoped that the LAB 2 testing results would show that the COMPANY 1 ear loop mask met the minimum standard for an N95 respirator and thus satisfy the "critical step" in testing of the finished mask.

67.     On or about May 27, 2020, LAB 2 emailed INDIVIDUAL 1 the test results, which showed that the COMPANY 1 ear loop mask failed to meet N95 standards.

68.     HOSPITAL 1 was not told about the failing LAB 2 test results.

69.     On or about July 16, 2020, COMPANY 1 finally received the results of LAB 1's testing of the COMPANY 1 mask, which showed another failure.   As the LAB 1 report stated, the samples did "not conform to the NIOSH N95 criteria for filter efficiency."   HOSPITAL 1 was not told about those results from LAB 1.

70.     JDM understood that the COMPANY 1 mask was shipped to the hospitals without a passing test on the finished mask.   On or about May 18, 2020, CW-1 and D. MOTHA texted:

| | |
|---|---|
| CW-1: | What ever happened with that [LAB 1] test |
| D. MOTHA: | I feel like it was bullshit!   Jeff [MOTHA] called [LAB 1] and they said that the date they have for completion is in July |
| CW-1: | What was?   [HOSPITAL 2] or [COMPANY 1] |
| D. MOTHA: | The [LAB 1] expedited test |
| CW-1: | Bunch of frauds |
| | Like [JDM REP. 1] said we all going to jail |

X.     <u>JDM and COMPANY 1 Provided HOSPITAL 1 NIOSH Testing and Approval Documents for a Different Mask</u>

71.     JDM and COMPANY 1 did not have a passing test result for the COMPANY 1 ear loop mask that was shipped to HOSPITAL 1.   JDM and COMPANY 1 instead sent NIOSH passing test results and approval documents to HOSPITAL 1 for a different mask: a version of the COMPANY 1 mask with a head strap attachment.   On or about May 27, 2020, pursuant to

16

an expedited, public health emergency procedure adopted by NIOSH, COMPANY 1 sought and obtained temporary NIOSH approval for that mask.

72.    On or about May 26, 2020, INDIVIDUAL 3 emailed D. MOTHA and J. MOTHA with the results of testing by NIOSH on the different COMPANY 1 mask, with the note: "pass!!! Official approval coming tomorrow, but you can share test data w [HOSPITAL 1] now.   finally, a passing test result that can be shared.   still no [LAB 1].   lol."   The test results only referred to the mask by a code name and did not specify that the model tested was COMPANY 1's head strap mask—not its ear loop mask.   D. MOTHA forwarded the NIOSH test results to HOSPITAL REP. 1 without stating that the test results only applied to the COMPANY 1 head strap masks. In this context, the NIOSH testing results were part of the labeling of the COMPANY 1 masks that accompanied the COMPANY 1 masks to HOSPITAL 1.

73.    On or about May 27, 2020, D. MOTHA emailed HOSPITAL REP. 1 the NIOSH approval documentation for the different COMPANY 1 mask with the note: "Niosh approval for [COMPANY 1 masks]."   HOSPITAL REP. 1 understood this as confirmation of what D. MOTHA had previously promised HOSPITAL 1: that the COMPANY 1 masks the hospital received would be NIOSH-approved N95 respirators.   In this context, the NIOSH approval documentation was part of the labeling of the COMPANY 1 masks that accompanied the COMPANY 1 masks to HOSPITAL 1.

74.    Because the test results and NIOSH approval did not apply to the non-NIOSH, non-N95 masks that were sold and shipped to HOSPITAL 1, these materials rendered the labeling for the masks false and misleading.

75.     COMPANY 1 understood that sending the NIOSH testing documents related to its head strap model could mislead purchasers of COMPANY 1's non-NIOSH, non-N95 ear loop mask.  On or about June 3, 2020, INDIVIDUAL 3 texted on WhatsApp with co-owners of COMPANY 1, including INDIVIDUAL 2.  INDIVIDUAL 3 suggested sending NIOSH test results to a potential buyer of the COMPANY 1 ear loop mask and INDIVIDUAL 2 replied in part: "I wouldn't do that because that's where you can get into real legal trouble of trying to pass off a non niosh mask as equivalently niosh I think we just have to kind of let it speak for itself."

76.     On or about June 9, 2020, two co-owners of COMPANY 1, INDIVIDUAL 4 and INDIVIDUAL 5, texted with each other on WhatsApp.  INDIVIDUAL 4 wrote: "Ready to be loaded?  We are oceans 11, war dogs and we did it over WhatsApp."

77.     On or about June 27, 2020, INDIVIDUAL 3 texted with INDIVIDUAL 2 and INDIVIDUAL 1 on WhatsApp to reflect on their experience with COMPANY 1 and a broadcast INDIVIDUAL 3 had heard earlier that day.  INDIVIDUAL 3 noted that one guest on the broadcast "was talking about 'billionaire mindset'" and said "their MO is 'ready, fire, aim!'" INDIVIDUAL 3 added:

> And that's if you get a huge order for something... you say YES and then figure out how to make it happen :-)

> Related to the mantra of "ask forgiveness instead of permission"

78.     When staff at HOSPITAL 1 evaluated the COMPANY 1 mask, they identified "many safety and compliance issues."  On or about June 30, 2020, a purchasing manager at HOSPITAL 1 emailed D. MOTHA, writing in part: "It seems the clinicians and nurses are complaining about the quality of the masks.  They've run into issues with tearing on the ear loops, and sizing where they are too small to fit their faces.  They honestly cannot be used for

many safety and compliance issues.   We have 836K masks on hand, can we return this amount?"

D. MOTHA shared the complaint with INDIVIDUAL 3, who in turn shared it with INDIVIDUAL

1 and the other managers of COMPANY 1.

79.     On or about the following day, July 1, 2020, CW-1 texted the following to D.

MOTHA and J. MOTHA:

> "Like [JDM REP. 1] said.   He took one look at the mask and said 'we are
> all going to jail' !!!   Lol … I'd def [say] to [COMPANY 1] this is the 3rd
> hospital plus Canada that has had major concerns with the product."

80.     On or about the following dates, COMPANY 1 shipped misbranded "N95" masks

from California to HOSPITAL 1 in Florida:

    a.   1,200 masks on or about May 1, 2020;

    b.   900 masks on or about May 2, 2020;

    c.   10,350 masks on or about May 5, 2020;

    d.   9,900 masks on or about May 7, 2020;

    e.   16,200 masks on or about May 8, 2020;

    f.   27,450 masks on or about May 11, 2020;

    g.   64,350 masks on or about May 15, 2020;

    h.   129,600 masks on or about May 19, 2020;

    i.   81,000 masks on or about May 22, 2020;

    j.   97,200 masks on or about May 29, 2020;

    k.   97,200 masks on or about June 1, 2020;

    l.   97,200 masks on or about June 4, 2020;

    m.   88,250 masks on or about June 9, 2020; and

    n.  97,200 masks on or about June 9, 2020.

81.    On or about July 3, 2020, D. MOTHA texted CW-1 and J. MOTHA a screenshot of a chart showing rising COVID-19 cases, with the note: "Crazy."   They then texted as follows:

| | |
|---|---|
| CW-1: | What about death rates |
| D. MOTHA: | They'll come |
| CW-1: | Yeah because [HOSPITAL 1] trusts your masks |

82.    In or around July 2020, HOSPITAL 1 demanded a refund for the COMPANY 1 masks.   Following discussions, JDM and COMPANY 1 agreed to accept the return of all masks from HOSPITAL 1 and provide a full refund to HOSPITAL 1 of $1.9 million.   HOSPITAL 1 did not use any of the COMPANY 1 masks and returned approximately 837,000 masks to COMPANY 1.

83.    On or about August 28, 2020, NIOSH's National Personal Protective Technology Laboratory tested a sample of ten COMPANY 1 masks that JDM and COMPANY 1 had caused to be shipped to HOSPITAL 1.   All ten COMPANY 1 masks fell under the 95% minimum level of filtration efficiency required for N95 respirators.

<u>COUNT ONE</u>
Conspiracy to Introduce Misbranded Devices into Interstate Commerce
(18 U.S.C. § 371)

The United States Attorney charges:

84.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-83 of this Information.

85.     From in or about April 2020 through in or about June 2020, in the District of Massachusetts, and elsewhere, the defendant,

JDM SUPPLY, LLC,

conspired with COMPANY 1 to introduce into interstate commerce misbranded medical devices with the intent to defraud and mislead, that is, the coconspirators conspired to sell and ship masks to HOSPITAL 1 that were misbranded as NIOSH-approved N95 respirators, when in fact the masks were not NIOSH-approved N95 respirators, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).

<u>Object and Purpose of the Conspiracy</u>

86.     The object of the conspiracy was to deceive HOSPITAL 1 into accepting and paying for approximately 837,000 defective COMPANY 1 masks by assuring HOSPITAL 1 that the masks were NIOSH-approved N95 respirators and providing false and misleading documentation to HOSPITAL 1 to support that false claim.   The principal purpose of the conspiracy and the scheme to defraud was to make money and provide cash flow for JDM and COMPANY 1 to keep the businesses going and generate profits for their owners.

<u>Manner and Means of the Conspiracy</u>

87.     Among the manner and means by which JDM and COMPANY 1 carried out the conspiracy were the following:

21

a.  Selling the COMPANY 1 mask to hospitals, including HOSPITAL 1, as an "N95 respirator" without testing on the finished mask or NIOSH approval.

b.  Providing marketing materials to induce hospitals to purchase the COMPANY 1 mask, including a one-page "spec sheet" that falsely described the COMPANY 1 ear loop mask as an "N95 Respirator."

c.  After HOSPITAL 1 threatened in early April 2020 to cancel its purchase orders for the COMPANY 1 N95 mask because the masks were not NIOSH-approved, reassuring HOSPITAL 1 that it would receive lab tested, NIOSH-approved N95 respirators.

d.  Shipping COMPANY 1 masks from California to HOSPITAL 1 in Florida without lab testing to confirm that the masks performed as N95 respirators.

e.  Shipping COMPANY 1 masks from California to HOSPITAL 1 in Florida that were not NIOSH-certified, *i.e.*, approved as N95 respirators by NIOSH.

f.  Concealing from HOSPITAL 1 testing showing that the COMPANY 1 mask did not perform as an N95 respirator, including test results from the University Lab and test results from LAB 2 received by INDIVIDUAL 1 on or about May 27, 2020, showing that a sample of COMPANY 1 masks failed N95 testing.

g.  Concealing from HOSPITAL 1 a known defect with the COMPANY 1 mask that caused the ear loop straps to break off the mask easily.

h.  Misbranding the COMPANY 1 masks shipped to HOSPITAL 1 by providing HOSPITAL 1 with passing test results and approval documents

from NIOSH, while concealing that those test results and approval were for a different model of respirator from what COMPANY 1 shipped to HOSPITAL 1.

Overt Acts in Furtherance of the Conspiracy and the Scheme to Defraud HOSPITAL 1

88.     On or about April 8, 2020, JDM emailed HOSPITAL REP. 1 with a spec sheet that falsely described the COMPANY 1 masks as "N95 respirators" and assured HOSPITAL REP. 1 that the COMPANY 1 masks received by the HOSPITAL 1 would be NIOSH-approved, N95 respirators.

89.     On or about May 26, 2020, JDM emailed HOSPITAL REP. 1 a copy of passing test results from NIOSH for a different mask, falsely claiming that these test results applied to the COMPANY 1 masks that HOSPITAL 1 received from COMPANY 1.

90.     On or about May 27, 2020, JDM emailed HOSPITAL REP. 1 a copy of NIOSH approval documentation for the different COMPANY 1 mask, falsely claiming that this approval applied to the COMPANY 1 masks that HOSPITAL 1 received from COMPANY 1.

91.     On or about the following dates, COMPANY 1 shipped misbranded "N95" masks from California to HOSPITAL 1 in Florida:

        a.   1,200 masks on or about May 1, 2020;

        b.   900 masks on or about May 2, 2020;

        c.   10,350 masks on or about May 5, 2020;

        d.   9,900 masks on or about May 7, 2020;

        e.   16,200 masks on or about May 8, 2020;

        f.   27,450 masks on or about May 11, 2020;

23

g.  64,350 masks on or about May 15, 2020;

h.  129,600 masks on or about May 19, 2020;

i.  81,000 masks on or about May 22, 2020;

j.  97,200 masks on or about May 29, 2020;

k.  97,200 masks on or about June 1, 2020;

l.  97,200 masks on or about June 4, 2020;

m.  88,250 masks on or about June 9, 2020; and

n.  97,200 masks on or about June 9, 2020.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT TWO</u>
Introduction of Misbranded Devices into Interstate Commerce
(21 U.S.C. §§ 331(a) and 333(a)(1))

The United States Attorney charges:

92.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-83 of this Information.

93.     From in or about April 2020 through in or about June 2020, in the District of Massachusetts, and elsewhere, the defendants,

DANIEL MOTHA and

JEFFREY MOTHA,

caused to be introduced into interstate commerce misbranded medical devices, that is, COMPANY 1 masks that were sold and shipped to HOSPITAL 1 that were misbranded as NIOSH-approved N95 respirators, when in fact the masks were not NIOSH-approved N95 respirators.

All in violation of Title 21, United States Code, Sections 331(a) and 333(a)(1).

25

COUNT THREE
Conspiracy to Commit Price Gouging
(18 U.S.C. § 371)

The United States Attorney charges:

94.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-83 of this Information.

95.     From in or about March 2020 through in or about July 2020, in the District of Massachusetts and elsewhere, the defendants,

DANIEL MOTHA and

JEFFREY MOTHA,

conspired with each other, CW-1, and others to commit an offense against the United States, to wit, price gouging in violation of the Defense Production Act, 50 U.S.C. §§ 4512, 4513, that is, willfully accumulating for the purpose of resale at prices in excess of prevailing market prices, materials which had been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation.

Overview of the Conspiracy to Commit Price Gouging

96.     From in or around March 2020 and extending through in or around July 2020, D. MOTHA, J. MOTHA, CW-1, and others conspired to exploit the critical need of hospitals and healthcare workers for PPE during the COVID-19 pandemic in an additional way: by price gouging with respect to N95 respirators.

97.     On or about March 18, 2020, the President issued Executive Order 13909, *see* 85 Fed. Reg. 16,277, invoking the powers vested in the President by the Defense Production Act of 1950, 50 U.S.C. §§ 4501 *et seq.* (the "Act").   The Act authorized the President to, among other

things, "allocate materials, services, and facilities in such a manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense."   50 U.S.C. § 4511(a)(2).   The President was permitted to exercise this authority "to control the general distribution of any material in the civilian market" if the President found "(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship."   50 U.S.C. § 4511(b).

98.     The Act further provided that "no person shall accumulate . . . for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation."   50 U.S.C. § 4512.   The Act required the President to publish, including in the Federal Register, "every designation of materials the accumulation of which is unlawful," and authorizes the President to "prescribe such conditions with respect to the accumulation of materials in excess of the reasonable demands of business, personal, or home consumption as he deems necessary to carry out the objectives of this chapter."   *Id.*

99.     On or about March 23, 2020, the President issued Executive Order 13910, delegating to the HHS Secretary the President's authority under 50 U.S.C. § 4512 to prevent the excess accumulation of certain "health and medical resources necessary to respond to the spread of COVID-19 within the United States."   *See* Fed. Reg. 17,001.

27

100.    On or about March 25, 2020, pursuant to the authority granted under 50 U.S.C. § 4512 and Executive Order 13910, the HHS Secretary, by public notice, *see* 85 Fed. Reg. 17592, designated 15 categories of health and medical resources under the Act as scarce materials and the supply of which would be threatened by accumulation in excess of reasonable demands of business, personal, or home consumption, or for the purpose of resale at prices in excess of prevailing market prices, including N95 filtering facepiece respirators.

101.    Prior to the COVID-19 pandemic, the hospitals to which JDM sold N95 respirators made by a leading manufacturer typically paid approximately $0.44 to $0.70 per respirator.   That leading manufacturer's published list price for its most common N95 respirator models ranged from $0.63 to $3.11 in 2020.   The manufacturer did not raise the prices for its N95 respirators during the relevant period.

102.    JDM, in contrast, offered to sell N95 respirators to hospitals for as much as $11.95 per mask.   JDM initially offered N95 respirators to hospitals on the following scale:

      a.    1,000 N95 respirators made by an internationally recognized manufacturer of PPE ("Renowned PPE Manufacturer") for $11.95 each;

      b.    2,000 Renowned PPE Manufacturer N95 respirators for $10.95 each;

      c.    5,000 Renowned PPE Manufacturer N95 respirators for $9.95 each; and

      d.    50,000 Renowned PPE Manufacturer N95 respirators for $8.95 each.

103.    In a text message sent on or about March 11, 2020, J. MOTHA (who worked in medical sales prior to the COVID-19 pandemic) described the opportunity to JDM REP. 2, whom

J. MOTHA recruited to work with JDM, as follows: "I got all the mass hospitals.   I'm telling you man start calling your contacts.   We can make a killing."

104.   For hospitals that balked at JDM's prices for N95 respirators (including HOSPITAL 1), JDM also offered a less expensive option: the COMPANY 1 "N95 Respirator."

105.   HOSPITAL 4, a hospital located in Massachusetts, paid JDM approximately $151,415 for more than 600 boxes of N95 respirators.   On or about April 17, 2020, a representative of HOSPITAL 4 contacted law enforcement with a list of what HOSPITAL 4 was accustomed to paying for various PPE, citing pre-pandemic prices for N95 respirators of $0.53 each.   HOSPITAL 4 reported that JDM charged "$5.50+ (on average)" per respirator, and that HOSPITAL 4 had never done business with JDM prior to the pandemic.

106.   JDM sold approximately 1,000 boxes of N95 respirators to various hospitals during the relevant period, with each box containing 20 or 30 respirators.   The weighted average price (*i.e.*, average price across the various models of Renowned PPE Manufacturer respirators, weighted by the quantity of each model purchased or sold) for JDM's purchases of Renowned PPE Manufacturer N95 respirators was approximately $4.48 per respirator.   The weighted average price for JDM's sales of N95 respirators to hospitals was approximately $9.91 per respirator.

107.   Communications among the coconspirators show that they understood that their sales of N95 respirators constituted price gouging.

108.   For instance, on or about April 1, 2020, CW-1 texted D. MOTHA and J. MOTHA the following about "loose" masks that were not in the manufacturer's packaging:

> CW-1:                         should be able to make back like 4200 on
>                               them, write the rest off as donations.   Listen

> if this goes bad at all with price gouging or anything we will need to show some donations

...

D. MOTHA:       Donations don't offset breaking the law

CW-1:           Better than nothing!!

And I'm pretty sure if you faced price gouging charges or fines a good lawyer could show donations to offset it

109.    On or about April 9, 2020, JDM REP. 3, a JDM sales representative recruited by D. MOTHA, warned D. MOTHA, J. MOTHA, and CW-1 about price gouging and law enforcement efforts relating to price gouging.

110.    JDM REP. 3 wrote: "You gotta be careful man" because a "friend talked to a person he knows at the fbi" and "they are going to audit every transaction."   D. MOTHA and J. MOTHA dismissed the warnings, and JDM REP. 3 responded: "Yes they are letting it go because people are dying.   But they will jail or heavily fine people."

111.    CW-1 replied to JDM REP. 3, D. MOTHA, and J. MOTHA: "'Price gouging' is open for interpretation.   And isn't a crime lol.   It's a civil fine."   CW-1 added: "Companies are responsible for hundreds of deaths in some cases and not 1 person goes to jail for 1 second."

112.    On or about April 17, 2020, CW-1 texted with JDM REP. 1.   In the texts, CW-1 described some of his work for JDM:

I've done buying and delivery such

And [J. MOTHA] using my name because he can't use his so my names all over this price gouging haha

30

> I was able to buy a bunch of masks in March that we sold at a 5-7$ markup

<u>Object and Purpose of the Conspiracy to Commit Price Gouging</u>

113.   The object of the conspiracy was to commit price gouging in violation of the Defense Production Act of 1950, 50 U.S.C. §§ 4501 *et seq.*, by accumulating N95 respirators during the COVID-19 pandemic for the purpose of reselling those respirators to hospitals in excess of the prevailing market price.   The principal purpose of the conspiracy was to make money and conceal the actions of the coconspirators from law enforcement.

<u>Manner and Means of the Conspiracy to Commit Price Gouging</u>

114.   Among the manner and means by which D. MOTHA, J. MOTHA, and other coconspirators carried out the conspiracy were the following:

  e.  Forming JDM to use as a vehicle to profit from the critical need of hospitals and healthcare workers for PPE during the COVID-19 pandemic.

  f.  Recruiting CW-1 to work for JDM.

  g.  CW-1 allowing J. MOTHA to use CW-1's name while conducting business on behalf of JDM to conceal J. MOTHA's identity and involvement with JDM.

  h.  Accumulating PPE, including N95 respirators, from various sources, including online marketplaces such as eBay and individuals who were able to obtain respirators from manufacturers in China.

i.      Using CW-1's residence to store accumulated PPE and then shipping PPE to customers.

j.      Reimbursing CW-1 for his purchases of PPE on behalf of JDM.

k.      Emailing and calling contacts at hospitals supplied by J. MOTHA in order to sell the PPE they accumulated to these hospitals.

l.      Marking up the price of the PPE sold to the hospitals to maximize their profit on the resale of the PPE.

<u>Overt Acts in Furtherance of the Conspiracy to Commit Price Gouging</u>

115.    From in or about March 2020 through in or about April 2020, D. MOTHA, J. MOTHA, and coconspirators committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

a.      On or about March 10, 2020, J. MOTHA texted JDM REP. 2: "Cost is like 7 per mask.   We charge 14.   Big pharma does it so do we."   (JDM REP. 2 replied: "Per mask?   We'll get in trouble.")

b.      On or about April 1, 2020, D. MOTHA, J. MOTHA, and CW-1 texted as set forth in Paragraph 108 above.

c.      On or about April 1, 2020, JDM purchased 15 boxes of N95 respirators (30 per box), at a price of $2.50 per respirator.

d.      On or about April 8, 2020, JDM received $19,360 from Hospital 4 for the purchase of 88 boxes of N95 respirators (20 per box), at a price of approximately $11 per respirator.

e.      On and about April 9, 2020, D. MOTHA, J. MOTHA, CW-1, and JDM REP. 3 texted as set forth in Paragraphs 109-111 above.

f.      On or about April 17, 2020, JDM received $16,000 from a VA Medical Center for the purchase of 80 boxes of N95 respirators (20 per box), at a price of $10 per respirator.

All in violation of Title 18, United States Code, Section 371.

FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

116.    Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Section 371 and Title 21, United States Code, Sections 331(a) and 333(a)(1) set forth in Counts One and Two, the defendants,

JDM SUPPLY, LLC,

DANIEL MOTHA, and

JEFFREY MOTHA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

117.    If any of the property described in Paragraph 116, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendants—

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property described in Paragraph 116 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

JOSHUA S. LEVY
Acting United States Attorney
District of Massachusetts


WILLIAM B. BRADY
HOWARD LOCKER
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: October _____, 2024