UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 24-cr-10309-MJJ |
| JEFFREY MOTHA, | ) ) | |
| Defendant. | ) ) ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

In March 2020, as the COVID pandemic overtook the United States, the nation's health care system faced an unprecedented crisis. Doctors, nurses, and other hospital workers stepped up, at considerable personal risk, to care for the sick. For these professionals, personal protective equipment, or PPE, provided a critical defense against the virus. And of this PPE, perhaps the most important—and most scarce—was the N95 filtering facepiece respirator, or N95 mask.

Many sought to take advantage of this crisis—including defendants Daniel and Jeffrey Motha and their newly created company, JDM Supply LLC (JDM). Drawn by the prospect of significant profits, the Mothas jumped into the PPE business as self-described "middlemen." They agreed to purchase supplies of N95s and sell the masks to hospitals at jacked-up prices, in violation of the Defense Production Act (DPA). And they crossed the line again then they sold to a hospital masks they misbranded as N95s (identified in the Information as "Hospital 1").

Defendants ignored multiple red flags, putting their own profits over the interests of the health care providers. They knew the stakes. As their best friend, whom they recruited to join JDM, repeatedly joked in response to those red flags: "We are all going to jail[.]"

1

Defendants did not do this alone. JDM's coconspirator, Advoque Safeguard LLC (Advoque), the manufacturer of the misbranded N95s, has also accepted responsibility for its role. But Defendants' role should not be minimized: they were the ones who dealt directly with Hospital 1 and sold them the masks. The sentence imposed here should send a message to other individuals who might seek to take advantage of the next crisis: if you sell critical items at inflated prices, you will be held accountable—particularly if you put providers' safety at risk.

For these reasons, as further set forth below, the government recommends that Defendant Jeffrey Motha be sentenced to 3 months in prison, 6 months of supervised release, a fine within the guidelines range as calculated by the Court at sentencing, and a mandatory special assessment of $50.

I. Background

The presentencing investigation report (PSR) in this case sets forth the relevant offense conduct, which the government summarizes below.

A. Misbranding of Advoque Masks (Count 2)

In or around the spring of 2020, during the earliest phase of the COVID-19 pandemic in the United States, seeing a way to make quick, substantial profits on scarce PPE, Advoque, a brand-new entrant in PPE manufacturing, and JDM conspired to ship facemasks that were misbranded as NIOSH-approved, N95 respirators. J. Motha co-owned JDM with D. Motha. J. Motha served as the company's head of sales.

Advoque told JDM that the Advoque masks would be certified as N95s and approved by the National Institute for Occupational Safety and Health (NIOSH), expecting that JDM would communicate that to hospitals as part of its sales pitch. JDM then sold the Advoque mask to hospitals as an "N95 respirator."

Between approximately March 17, 2020 and April 10, 2020, one hospital, Hospital 1, ordered a total of approximately 850,000 Advoque N95 masks from JDM at a total price of approximately $2.6 million. Hospital 1 paid JDM 15% of the total cost (approximately $374,000) as a deposit at the time of the purchase order. Hospital 1 paid the remaining balance upon delivery and acceptance of the Advoque masks. Hospital 1 did so because JDM and Advoque misled the hospital into believing the masks were NIOSH-approved N95 respirators.

Advoque and JDM did not have a passing test result for the Advoque ear loop mask that was shipped to Hospital 1. JDM instead sent NIOSH passing test results and approval documents to Hospital 1 for a different mask: a version of the Advoque mask with a head strap attachment. Because the test results and NIOSH approval did not apply to the non-NIOSH, non-N95 masks that were sold and shipped to Hospital 1, these materials rendered the labeling for the masks false and misleading.

On or about July 1, 2020, CW-1 texted the following to D. Motha and J. Motha:

> "Like [INDIVIDUAL 5] said. He took one look at the mask and said 'we are all going to jail' !!! Lol … I'd def [say] to [ADVOQUE] this is the 3rd hospital plus Canada that has had major concerns with the product."

In or around July 2020, Hospital 1 demanded a refund for the Advoque masks. Following discussions, Advoque and JDM agreed to accept the return of all masks from Hospital 1 and provide a full refund to Hospital 1. Hospital 1 did not use any of the Advoque masks and returned them to Advoque.

On or about August 28, 2020, NIOSH's National Personal Protective Technology Laboratory tested a sample of ten Advoque masks that Advoque and JDM had caused to be shipped to Hospital 1. All ten Advoque masks tested between 83.94% and 93.24% filtration efficiency—under the 95% minimum level of filtration efficiency required for N95 respirators.

      B.      <u>Conspiracy to Violate the Defense Production Act (Count 3)</u>

From in or around March 2020 and extending through in or around July 2020, D. Motha, J. Motha, CW-1, and others conspired in an additional way to exploit the need of hospitals and healthcare workers for PPE during the COVID-19 pandemic: by price gouging with respect to N95 respirators.

JDM sold approximately 1,000 boxes of N95 respirators to various hospitals during the relevant period, with each box containing 20 or 30 respirators. The average price for JDM's purchases of 3M N95 respirators was between approximately $4 - $5 per respirator. The average price for JDM's sales of N95 respirators to hospitals was between approximately $9.50 - $10.50 per respirator. Communications among the coconspirators show that they understood that their sales of N95 respirators constituted price gouging.

For instance, on or about April 9, 2020, JDM REP. 3, a JDM sales representative recruited by D. Motha, warned D. Motha, J. Motha, and CW-1 about price gouging and law enforcement efforts relating to price gouging.

JDM REP. 3 wrote: "You gotta be careful man" because a "friend talked to a person he knows at the fbi" and "they are going to audit every transaction." JDM REP. 3 added: "Anything [over] the 10-15% markup on a case by case[.]"

D. Motha and J. Motha dismissed the warnings, and JDM REP. 3 responded: "Yes they are letting it go because people are dying. But they will jail or heavily fine people." CW-1 replied to JDM REP. 3, D. Motha, and J. Motha: "'Price gouging' is open for interpretation. And isn't a crime lol. It's a civil fine." CW-1 added: "Companies are responsible for hundreds of deaths in some cases and not 1 person goes to jail for 1 second."

II.     Sentencing Guidelines

There is a plea agreement between the government and J. Motha.   ECF No. 5.   In the plea agreement, the parties agree that Defendant's total "offense level" under the Guidelines is 2.   *Id.*  In the PSR, however, the Probation Office concluded that Defendant's total offense level is 6, based on two differences.   PSR ¶ 129.

*First*, the PSR includes a 2-level increase pursuant to USSG § 3D1.4 because Defendant is convicted of multiple counts, each of which is assigned 1 unit.   *Id.* ¶ 125.   The parties did not include this 2-level increase in their calculation of the "combined offense level" in the plea agreement.

*Second*, the PSR does not include a 2-level decrease for a "zero point offender," pursuant to U.S.S.G. § 4C1.1(a), based on a motor vehicle offense from 2011 that was continued without a finding (CWOF) and ultimately dismissed.   PSR ¶ 132.

The government acknowledges that this was an error, and that the Probation Office's calculation is apparently correct.   Nevertheless, the government's sentencing recommendation follows and is consistent with its plea agreement with Defendant.

In either case, the Guidelines sentencing range is 0 to 6 months and within Zone A of the Sentencing Table.

III.    Section 3553(a) Factors

In determining a defendant's sentence, the Court must consider the Guidelines and determine the advisory sentencing guideline range, which, once calculated, establishes the court's "starting point" or "initial benchmark."   *See Gall v. United States*, 552 U.S. 38, 49 (2007).   Next, the court should consider the various factors set forth in 18 U.S.C. § 3553(a).

Here, the government's recommended sentence of 3 months' imprisonment, a fine within

the guidelines range, and 6 months of supervised release are supported by the § 3553(a) factors, including the seriousness of the offense and the need to promote respect for the law; the history and characteristics of the Defendant; and the need for deterrence. The government's recommended sentence for Defendant J. Motha is one month less than its recommended sentence for his brother, D. Motha. This difference reflects the relative culpability of these two defendants: while they both owned and operated JDM, D. Motha dealt directly with Hospital 1 and was responsible for the communications that resulted in the misbranding charge. For the reasons further set forth below, the government's recommendation for J. Motha is consistent with the § 3553(a) factors and the government's recommendation for his codefendant, D. Motha.

*First*, Defendant's crimes, though misdemeanors, are serious federal offenses in the context of the COVID-19 pandemic. *See* 18 U.S.C. § 3553(a)(2)(A). Defendants took advantage of the hospitals and health care providers to "make a killing" (J. Motha's phrase) through their sales of N95 masks. Defendants jumped into the market, purchased (limited supplies of) masks, and sold them to hospitals at inflated profits. And they sold masks that they represented were N95s even though they were not to a hospital as the first wave of COVID cases crested.

Defendant seeks to minimize these offenses with his objections to the PSR, many of which seek to cast blame on others: on the government, for "severely bungl[ing]" its response to the pandemic; on Advoque, JDM's conspirator, for Advoque's role with the misbranded masks; and on Hospital 1, for not detecting the truth sooner. Defendant's efforts to shift blame suggest that Defendant does not fully grasp the error of his ways or the seriousness of his conduct. The sentence imposed should make clear that Defendant is responsible for his own actions, and that those actions warrant punishment.

That the misbranding charge is a strict liability offense that requires no proof of intent is

of no moment. This is a strict liability offense for a reason: because the health and safety of the public is paramount. Those Defendant recruited for JDM understood this; as one individual wrote in a text message to J. Motha, they were "all going to get locked up … when this [shit] doesn't work and we infect 5000 nurses." PSR ¶ 50. Defendant, however, put profits over public safety.

The government acknowledges that mitigating factors are present here, including the fact that JDM and Advoque returned the hospital's money and accepted the return of the misbranded masks. The masks did not say N95 on them, nor did the boxes say N95 on them. Defendant did not set out at the beginning to sell misbranded masks to the hospital; he believed in the representations of Advoque and shared those with the hospital. (As J. Motha texted in April 2020, all that mattered was that the mask would be "N95 niosh approved"—part of the process that was handled by Advoque.)

The problem is that those representations about the masks were false—the masks were not N95—and Defendants saw red flag after red flag to that effect. Indeed, at one point, Advoque told Defendants that the masks were not approved and could not be marketed as N95 respirators. But Defendants did not share the truth with the hospital. That is where Defendants crossed the line, and that was a serious offense.

With respect to the conspiracy to violate the DPA, Defendant challenges the timing of the invocation of the DPA and argues that most of the conduct cited in the PSR predates that and is thus irrelevant. Those facts illustrate Defendant's intent: to charge hospitals as much as they could for the N95s they had accumulated. When the DPA went into effect, Defendant had a choice: stop and conform his actions to the requirements of the law or keep going. Defendant chose to keep going—despite a clear warning from his business associate—again choosing money over respect for the law and public safety.

Given the seriousness of these offenses, a period of incarceration is appropriate.

*Second*, the Defendant's history and personal characteristics support the government's recommended sentence. *See* 18 U.S.C. § 3553(a)(1). These were not crimes of desperation. At the time, Defendant was earning $200,000 per year as a sales associate for a medical equipment supplier. PSR ¶ 151. Indeed, Defendant drew on his background in medical sales to carry out these offenses. He had a college education and supportive family and upbringing. These were crimes of greed—opportunistic conduct to profit from a national crisis.

*Third*, the government's recommended sentence promotes general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). "As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as particularly important in the area of white collar crime." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citations omitted). The government's resources are limited; when defendants are convicted of white collar crimes, the sentences imposed should serve as a warning to others who might be tempted to follow the same path. This is particularly important in health care cases, where violations can put health care workers, patients, and the public at risk. The sentence imposed here should send the message that those who choose to enter the medical device business must play by the rules or face serious consequences.

This case arose out of an unprecedented public health emergency, a global pandemic that claimed the lives of over 1.2 million Americans.[1] There will be other public health crises, and with them, opportunities for criminals to prey on others. The sentence imposed in this case should send a clear message that, instead of illicit profits, such conduct will incur financial penalties and

---

[1] https://covid.cdc.gov/covid-data-tracker/#maps_deaths-total.

imprisonment.

  IV.  <u>Monetary Penalties</u>

  Consistent with its plea agreement, the government is recommending a fine within the Guidelines sentencing range a calculated by the Court at sentencing, excluding departures, unless the Court finds that Defendant is not able, and is not likely to become able to pay a fine.  In the PSR, the Probation Office calculates the Guidelines fine range as $500 to $9,500.  PSR ¶ 168.  As set forth in more detail below, a fine at the high end of this range, $9,500, is appropriate.

  Regarding restitution, the Court could order discretionary restitution on Count 3 (Conspiracy to Violate the DPA) to compensate the hospitals for their loss in overpaying for N95 masks.  However, the relevant statute provides that, for misdemeanor offenses like Count 3, a court may only order restitution "in lieu of any other penalty authorized by law." *See* 18 U.S.C. 3663(a)(1)(A).  Here, the Court could order restitution solely on Count 3 and impose other penalties—including imprisonment—on Count 2.  However, for simplicity's sake, a concurrent sentence of imprisonment and a fine meets the goals of sentencing.

  In determining an appropriate fine, the victim hospitals suffered a loss based on Defendant's excessive markup of N95 respirators.  While the DPA does not define "prices in excess of prevailing market prices," courts have looked to the prices charged by established vendors in the relevant market, not new market entrants seeking to inflate prices above those routinely charged in the relevant market.  *See United States v. Bulloch*, 615 F. Supp. 3d 175, 183 (E.D.N.Y. 2022) (citing *United States v. Topouzian*, 2021 WL 5882204, at *6 (N.D. Ill. Dec. 13, 2021)) (both cases involving excessive prices for respirators during the pandemic).  In *Bulloch*, for instance, the Court instructed the jury that in considering what constituted resale in excess of

9

prevailing market prices, jurors could "consider the degree of the Defendant's markup or profit (or his intended markup or profit)[.]" *Bulloch*, 1:20-cr-00181-PK, Dkt. 68 at 23 (7/22/22).

The government acknowledges that Defendants, as so-called middlemen, purchased N95 respirators at prices that were well above the pre-pandemic prices for such respirators. But Defendants accumulated those N95 respirators for the purpose of further marking them up and resold them "in excess of prevailing market prices."

The DPA does not specify the precise point at which a seller's markup becomes "in excess of prevailing market prices." In this case, the government's position is that a markup greater than 15% was "in excess of prevailing market prices." This was the threshold that the Defendants' employee (who is identified in the Information as "JDM Rep. 3") warned them about. On or about April 9, 2020, JDM Rep. 3 told Defendants that law enforcement were "going to audit every transaction" and "[a]nything [over] the 10-15% markup on a case by case[.]" *See* PSR ¶ 102.

This is consistent with existing state price gouging laws that provide for price increases between 10% and 30%.[2] For example, a price increase in excess of 10% above "the price at which the good or service was sold . . . by the seller in the usual course of business immediately prior to the state of emergency," is presumed to be an "[e]xcessive price increase" under the New Jersey price gouging statute. *See* N.J. Stat. Ann. § 56:8-108 (2002), *see also* 73 Pa. Cons. Stat. § 232.4(b) (2007) (PA law providing that a price which "exceeds an amount equal to or in excess of 20% of the average price" shall be considered prima facie evidence of an unconscionably excessive price).

---

[2] *See* https://www.proskauer.com/blog/pricing-controls-under-the-defense-production-act, dated July 16, 2020 (last accessed: December 2, 2024).

Moreover, in Massachusetts, a proposed law specific to PPE prices charged prior to a public health emergency sets a 15% threshold.[3]

The government has identified a Massachusetts-based hospital (identified as "Hospital 4" in the Information) and three Veteran's Administration hospitals that purchased N95s from JDM at excessive (*i.e.,* more than 15%) markups. For Hospital 4, the excessive markup they paid was $17,152, and for the VA hospitals, the amount ranged from $1,564 to $10,322. Across all four hospitals, the total loss is $41,991.

To the extent the Court is not inclined to order restitution based on these calculations, these excessive profits support a fine at the high end of the Guidelines range, in addition to a sentence of imprisonment.

V.   Conclusion

For the foregoing reasons, the government respectfully submits that the appropriate sentence in this case is 3 months' imprisonment, a fine of $9,500, 6 months of supervised release, and the mandatory $50 special assessment.

Respectfully Submitted,

LEAH B. FOLEY
United States Attorney
District of Massachusetts

 /s/ William B. Brady
WILLIAM B. BRADY
HOWARD LOCKER
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

Dated: March 4, 2025

---

[3] *See* https://malegislature.gov/Bills/193/H396 (last accessed: December 2, 2024).

## **CERTIFICATE OF SERVICE**

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ William B. Brady*
William B. Brady
Assistant United States Attorney

Dated: March 4, 2025